[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 22-12495

_____

NORTH AMERICAN ON-SITE, LLC,

                                                         Plaintiff-Appellant,

*versus*

ZURICH AMERICAN INSURANCE CO.,

                                                         Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:20-cv-03741-VMC

_____

Before WILLIAM PRYOR, Chief Judge, ROSENBAUM and ABUDU, Circuit Judges.

ABUDU, Circuit Judge:

The instant appeal requires this Court to decide whether an insurance agreement issued by Defendant-Appellee Zurich American Insurance Company covers losses that Plaintiff-Appellant North American On-Site, LLC ("NAOS") incurred from the costs of correcting clerical errors it made in its administration of a retirement plan. In particular, we must determine whether NAOS's costs of remediation qualify as damages that it was legally obligated to pay. Because we answer that question in the affirmative, those losses were covered by the insurance policies, and we vacate the district court's grant of summary judgment in Zurich's favor.

## I.    BACKGROUND

In its administration of a 401(k) retirement plan (the "Plan"), NAOS made numerous clerical errors. Those errors eventually cost NAOS approximately $500,000, which included legal and accounting fees to investigate and address the errors, corrective contributions to the Plan, and late payments to the U.S. Department of Labor. At the time of the errors, NAOS was insured under several commercial liability policies that Zurich issued (the "Policies"). After NAOS made payments to correct its errors, it filed a claim with Zurich for reimbursement of its costs incurred. Zurich denied the claim, and that denial formed the basis of the instant lawsuit.

NAOS, a Florida limited liability company, is the administrator of the Plan, which provides retirement investment benefits to

NAOS's participating employees. Between 2015 and 2018, NAOS made clerical errors affecting some of its employees' contributions to and participation in the Plan. The errors included (1) a failure to accurately document, withhold, and invest pre-tax deferrals as elected by each employee; (2) a failure to include certain Ohio employees in reports to the Plan's service provider, resulting in the improper exclusion of the Ohio employees from the Plan; and (3) a failure to download and provide the Plan's service provider with a deferral rate report each payroll period. These clerical errors resulted in insufficient paycheck deductions for some employees participating in the Plan.

Beginning in September 2018, NAOS began to understand the extent and causes of the errors in its administration of the Plan. That month, the broker for the Plan, who was not a NAOS employee, advised NAOS's plan administrator, James Riley, that the Plan had "several previous and ongoing operational failures" that would likely require assistance from an ERISA attorney to correct. NAOS claimed that it did not notify Zurich of the problems with the Plan at that time because it had no knowledge of actual employee errors. The next month, an account manager who serviced the Plan informed Riley that NAOS was not administering the Plan properly with respect to auto-enrolling newly eligible participants. The account manager explained that NAOS could self-correct this error by adopting a reasonable correction method "placing affected participants in the same position they would have been had this mistake not occurred." He advised that an appropriate self-correction may include making up missed deferrals.

In response to the identified errors, NAOS engaged a law firm in October 2018 to review the Plan and recommend appropriate corrections. Counsel for NAOS indicated that according to IRS regulations, NAOS was legally obligated to make corrective contributions to the Plan to maintain the qualified status and tax-deferred benefits of the Plan. NAOS's counsel explained that the threat of plan disqualification from the IRS arose at the moment the errors occurred and continued until the date that NAOS made the corrections. In addition to the threat of plan disqualification, NAOS's counsel advised that failure to make corrective contributions created a "snowball effect" that increased the amount required to correct those errors over time. Based upon counsel's advice, NAOS made corrective contributions to the Plan at its own expense.

The corrective contributions required NAOS to pay into the Plan the amount (or a portion of the amount) that would have been deferred from employees' paychecks, plus the earnings that would have been generated, but for the errors. NAOS made those corrective contributions to the Plan in 2019, amounting to a total of $309,253.11.

NAOS's losses tied to its clerical errors were not limited to the corrective payments. Because of the errors, NAOS was unable to complete necessary plan audits to timely file certain IRS reports for the Plan. As a result of NAOS's untimely filings, in early 2019, the Department of Labor filed two administrative cases seeking penalties from NAOS in excess of $74,000. NAOS's counsel negotiated a $14,800 settlement for those two cases, which NAOS paid

in July 2019.  In addition, NAOS's response to and remediation of its errors resulted in an accrual of $54,003.90 in fees for its accountants' work and $122,782.50 in fees for legal counsel.  Overall, the corrective work to refund the plan and complete proper filings occurred over a period of several months from the end of 2018 through 2019, and NAOS claims that it incurred a total cost of $500,839.51 to remedy the mistakes it made with respect to administering the Plan.

As NAOS became aware of and then began to address its clerical errors, it sought indemnification under applicable insurance policies.  At the time NAOS made the above-described errors and remediation payments, NAOS was insured under the Policies.  NAOS purchased the Policies, which were issued by Zurich, from its insurance broker, Brown & Brown, Inc., and the Policies contained "Employee Benefits Liability" coverage regarding NAOS's administration of its employee benefit programs.  As was its practice with prior claims filed under the Policies, NAOS notified Brown & Brown of its losses incurred as a result of the errors.  In response, Brown & Brown told NAOS that the Policies did not cover the type of claim or losses incurred.

After receiving Brown & Brown's response to the proposed claim, NAOS sought a new insurance broker.  In December 2019, NAOS changed its insurance broker to Parrish & Gwinn Insurance Group, LLC.  Parrish & Gwinn evaluated NAOS's insurance policies in effect at the time, and NAOS expressed its intention to acquire insurance that would cover losses such as those resulting

from the clerical errors.  After its review, Parrish & Gwinn told NAOS that no additional insurance was needed because Zurich's Policies should have provided coverage for NAOS's losses arising from the clerical errors.

Zurich provided NAOS with yearly insurance policies on a successive basis from 2015 to 2019.  In pertinent part, each renewal policy contained identical "Employee Benefits Liability" coverage sections.  Those sections stated that:

> We will pay those sums that the "insured" becomes legally obligated to pay as damages because of any act, error, or omission of the "insured" in the "administration" of the "insured's" "employee benefit programs."

The Policies defined "administration" to include "[h]andling records in connection with 'employee benefit programs'" and "[e]ffecting or terminating an 'employee's' participation in a plan included in 'employee benefit programs.'"

In addition, the Policies contained several conditions for coverage.  First, they specified that "[n]o insureds will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense without [Zurich's] consent."  Second, the Policies stated that they did not apply to claims or suits arising out of the insured's liability as a fiduciary under ERISA and the tax code.  Third, the Policies also contained a notice provision, requiring NAOS to notify Zurich "as soon as practicable of any act, error, or omission which may result in a claim."  Finally, each of the

Policies provided that NAOS did not have the right to sue Zurich "on this Coverage Part unless all of its terms have been fully complied with."

On January 7, 2020, at NAOS's request, Parrish & Gwinn notified Zurich of NAOS's claim seeking insurance coverage for the costs incurred in correcting its errors in administering the Plan. That same day, Zurich acknowledged the claim in writing. Ten days later, NAOS submitted a letter, as requested by Zurich, summarizing the errors and losses for which NAOS sought coverage. Following a review of NAOS's submissions, Zurich denied coverage for the claim, first through a phone call and then officially through a March 31, 2020, denial of coverage letter. In the letter, Zurich stated that "the Policy . . . does not provide defense or indemnity coverage to [NAOS] for this Claim." Zurich gave two reasons for its decision: (1) NAOS "made payments . . . prior to notifying Zurich and without Zurich's consent" and (2) "[t]he Claim is for failure to adequately administer ERISA related programs." The denial letter also contained a section entitled "Reservation of Rights," which purported to reserve other alternative grounds to deny the claim.

In response to Zurich's claim denial, NAOS sued Zurich on August 4, 2020, asserting claims under Georgia law for (1) breach of contract and (2) bad faith damages pursuant to O.C.G.A. § 33-4-6. Zurich raised several defenses, including an assertion that NAOS's losses did not trigger the Policies' coverage agreement because those losses were not amounts that NAOS was "legally

obligated to pay as damages" to any third party who had asserted a liability claim against NAOS (Zurich's Third Defense), and that the Policies did not cover NAOS's voluntary payments (Zurich's Fifth Defense). Zurich later moved for summary judgment on both of NAOS's claims, arguing in pertinent part that the insuring agreement had not been triggered because NAOS had no legal obligation to pay damages to a third party. In addition, Zurich argued that NAOS's claims failed because NAOS breached the Policies' voluntary payment and timely notice provisions, and because the alleged losses fell under the Policies' ERISA exclusion.

The district court found that NAOS's losses did not trigger the Policies' coverage agreement because those amounts were not damages that NAOS was legally obligated to pay. The court granted Zurich's motion for summary judgment on that basis, and it did not address any of Zurich's other arguments. NAOS now appeals from that order and judgment.

## II.    STANDARD OF REVIEW

This Court reviews a district court's grant of summary judgment *de novo*. *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1263 (11th Cir. 2010). Summary judgment is appropriate when a movant shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is "material" if it could "affect the outcome of the suit under the governing law." *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1303 (11th Cir. 2016) (internal citation and quotation marks omitted).

The party moving for summary judgment bears the initial burden of showing a lack of dispute as to any material fact. *Paylor v. Hartford Fire Ins. Co.*, 748 F.3d 1117, 1121 (11th Cir. 2014). "[O]nce that burden is met[,] the burden shifts to the nonmoving party to bring the court's attention to evidence demonstrating a genuine issue for trial." *Id.* Establishing that a genuine dispute of fact exists requires more than speculation or conjecture. *See Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005). However, on summary judgment, we view the record evidence in the light most favorable to the nonmovant, and we make all reasonable inferences in its favor. *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991) (*en banc*). In addition, we may affirm summary judgment on any ground supported by the record. *Burton v. Tampa Hous. Auth.*, 271 F.3d 1274, 1277 (11th Cir. 2001).

## III.  DISCUSSION

We proceed in two parts. First, we identify the applicable Georgia law that governs this dispute involving the interpretation and construction of insurance policies. Second, we explain that pursuant to the Policies, NAOS's losses resulting from its clerical errors were damages that it was legally obligated to pay and that, accordingly, they were within the Policies' scope of coverage.

### A.  *Under the Applicable Georgia Law, Any Ambiguity in the Policies Is Construed in Favor of Coverage.*

Georgia law governs this dispute. Specifically, this appeal arises from a case originally filed in the Superior Court of Gwinnett County, Georgia, and removed to the district court based on

diversity jurisdiction.  Federal courts sitting in diversity jurisdiction apply the law of the state in which they sit.  *See Eres v. Progressive Am. Ins. Co.*, 998 F.3d 1273, 1278 n.4 (11th Cir. 2021).  Under Georgia law, insurance contracts are governed by the rule of *lex loci contractus*, which provides that a contract is governed by the law of the jurisdiction in which it was made.  *Johnson v. Occidental Fire & Cas. Co. of N.C.*, 954 F.2d 1581, 1583–84 (11th Cir. 1992).  Because Zurich issued and delivered the Policies, which do not include a choice of law provision, in Georgia, we apply Georgia law.  *See id.*

In a dispute over insurance coverage, we first look to the question of insurance coverage generally and then to any applicable exclusions.  *See Mindis Metals, Inc. v. Transp. Ins. Co.*, 209 F.3d 1296, 1298 (11th Cir. 2000).  Georgia courts interpret insurance policies according to their plain language and in the light in which a layman would read the policies.  *Old Republic Nat'l Title Ins. Co. v. RM Kids, LLC*, 835 S.E.2d 21, 25–26 (Ga. Ct. App. 2019).  In addition, Georgia law generally construes insurance contracts against the insurer and in favor of the insured.  *Brown v. Assurance Am. Ins. Co.*, 841 S.E.2d 15, 16–17 (Ga. Ct. App. 2020).  Thus, where a policy provision is subject to multiple reasonable interpretations, we must follow the interpretation most favorable to the insured and with a leaning towards coverage.  *Id.*; *see also* O.C.G.A. § 13-2-2(5) ("If the construction is doubtful, that which goes most strongly against the party executing the instrument or undertaking the obligation is generally to be preferred.").  If a claim is within the scope of a policy's coverage, we narrowly construe any exceptions, limitations, or exclusions to coverage.  *See Mindis Metals*, 209 F.3d at 1300.

### B. NAOS's Losses Are Damages that Zurich Was Legally Obligated to Pay.

Zurich argues that the Policies did not cover NAOS's claim because NAOS never incurred any legal obligation to pay damages to a third party. In particular, Zurich contends that because no third party pursued a claim against NAOS for damages arising from the clerical errors, NAOS cannot establish that it was legally obligated to make corrective payments. We disagree.

Pursuant to the Policies, Zurich is required to indemnify NAOS for those sums NAOS "becomes legally obligated to pay as damages because of any act, error, or omission . . . in the 'administration' of [NAOS's] 'employee benefit programs.'" As an initial matter, although no lawsuit had been initiated against NAOS to make the corrective payments, counsel for NAOS advised that based on IRS regulations, NAOS was legally obligated to make the payments and that delaying those required payments would have further increased NAOS's costs and subjected it to an additional risk of adverse action from the IRS. In fact, counsel for Zurich conceded that federal law required NAOS to make the corrective payments.

Moreover, Zurich's interpretation of "legally required," attempts to make the second sentence of the relevant provision—"the right and duty to defend the 'insured' against any suit"—a precondition for triggering the preceding sentence which speaks only to "becom[ing] legally obligated to pay" which, as stated earlier, was satisfied based on the IRS's regulations. When read as a whole,

the provision merely identifies another basis upon which NAOS could invoke the policy, but it does not make the filing of a lawsuit the only basis. *See Ryan v. State Farm Mut. Auto. Ins. Co.*, 413 S.E.2d 705, 707 (Ga. 1992) (establishing that when interpreting insurance contracts, the court must ascertain the intentions of the parties "by looking to the insurance contract as a whole"). Even assuming Zurich's proposed interpretation of the Policies is reasonable, Georgia law requires us to apply the reasonable interpretation that favors coverage. *MAG Mut. Ins. Co. v. Gatewood*, 367 S.E.2d 63, 67 (Ga. Ct. App. 1988) ("Where [an insurance] provision is susceptible of two or more interpretations, the court will construe it most favorably to the insured." (alteration adopted) (internal citation and quotation marks omitted)); *see also Lunceford v. Peachtree Cas. Ins. Co.*, 495 S.E.2d 88, 89 (Ga. Ct. App. 1997) ("[T]he law is clear in this state that an insurer, having affirmatively expressed coverage in broad promissory terms, has a duty to define any limitations or exclusions clearly and explicitly." (internal citation quotation marks omitted)).

Zurich notes that Georgia courts have not required insurers to compensate insureds for "voluntary" payments made without the insurer's consent. For example, the Georgia Supreme Court held that an insurer did not need to compensate an insured when it made a unilateral decision to pay about $1 million to settle a third party's claims even though the insurer had offered only $200,000 in negotiations. *Trinity Outdoor, LLC v. Cent. Mut. Ins. Co.*, 679 S.E.2d 10, 12 (Ga. 2009); *see also Hathaway Dev. Co., Inc. v. Ill. Union Ins. Co.*, 274 Fed. App'x 787, 791 (11th Cir. 2008) (unpublished) (insured

"breached the Policy by undertaking to fix defects and make payments to residents, albeit with good intention, yet without [the insurer's] prior consent;" such payments were "at [insured's] peril and not at the cost of the insurer").

Here, a Zurich representative conceded that NAOS was "legally obligated" to make the corrective contributions. Zurich does not now claim that it would have resolved the issues differently had it been involved. Moreover, unlike in cases like *Trinity* or *Hathaway*, where the harm caused by the insured was a one-time incident, NAOS's errors triggered an immediate and ongoing obligation to contribute to the Plan to maintain its qualified status. We do not read *Trinity* as addressing the compensability of payments made by an insured to mitigate an ongoing, as opposed to completed, legal wrong.

To the extent Zurich relies upon the district court's statement that NAOS's corrective contributions "were sums that NAOS would have already paid into the Plan under the terms of the Plan," that reliance is misplaced. The clerical errors resulted in NAOS's failure to properly deduct contributions from employee paychecks; thus, NAOS paid "plan contributions out of its own pocket that in the normal course would have been paid by NAOS employees, not NAOS." Moreover, Georgia law compels a finding that even additional costs incurred by NAOS above and beyond the initial contribution amounts owed to its employee accounts would be damages covered under the Policies. *See, e.g. Greenwood Cemetery, Inc. v. Travelers Indem. Co.*, 232 S.E.2d 910, 913 (1977) (finding coverage for

punitive damages where the insurer agreed to pay sums "which the insured shall become legally obligated to pay as damages for mental anguish" because the word "for" is ambiguous and therefore should be strictly construed against the insurer (cleaned up)); *Lunceford*, 495 S.E.2d at 89–91 (construing "damages for which any insured person is legally liable because of bodily injury and property damage" broadly in favor of coverage, including punitive damages).  Because NAOS's corrective payments qualified as damages it was legally obligated to pay given its clerical errors in the administration of its employee benefits programs, the Policies covered the insurance claim at issue.[1]  Zurich is not entitled to summary judgment on NAOS's breach of contract claim on the basis of Zurich's coverage defense.

Finally, this Court declines to address here Zurich's additional defenses raised in support of its denial of coverage.  At both summary judgment and on appeal, Zurich presented additional defenses that were included in its March 2020 denial letter.  On

---

[1] The parties also heavily dispute whether Zurich's failure to mention its coverage defense in the denial of coverage letter constituted a waiver of that defense.  This Court has previously distinguished between coverage and policy defenses under Georgia law, and we have found that the former may not be waived while the latter may.  *See AEGIS Elec. & Gas Int'l Servs. Ltd. v. ECI Mgmt. LLC*, 967 F.3d 1216, 1226 n.8 (11th Cir. 2020).  However, as noted by one member of that panel, the insurance waiver issue remains "a vexing and disputed issue of Georgia law."  *Id.* at 1228 n.1 (Wilson, J., concurring in part and dissenting in part).  Here, Zurich's coverage defense fails for the above reasons, regardless of whether it was waived.  Accordingly, we need not answer this non-dispositive question of state law.

appeal, neither party addressed those arguments at length, which is understandable, given that the district court's judgment relied on neither.[2]  Because those defenses were not initially addressed by the district court, we decline to address them for the first time on appeal.  *See Stansell v. Revolutionary Armed Forces of Colombia*, 45 F.4th 1340, 1348 (11th Cir. 2022) (explaining that "we are a court of review, not a court of first view" (alterations adopted) (quoting *Callahan v. U.S. Dep't of Health & Hum. Servs.*, 939 F.3d 1251, 1266 (11th Cir. 2019))).  Accordingly, we remand this case to the district court for further proceedings, which may include consideration of Zurich's other defenses.[3]

## IV.    CONCLUSION

For the foregoing reasons, we **VACATE** the district court's grant of summary judgment in favor of Zurich as to both of NAOS's claims, and we **REMAND** this case for further consideration in accordance with this opinion.

---

[2] Although the district court acknowledged that there was significant overlap between Zurich's coverage defense and its voluntary payment defense, it did not expressly rule on the latter.

[3] The district court's dismissal of NAOS's bad faith claim was premised on its grant of summary judgment as to NAOS's breach of contract claim.  Because we vacate the grant of summary judgment on the breach of contract claim, we also vacate the judgment on the bad faith claim.